**FILED**

DEC 1 1 2017

Clerk, U.S. District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DIST4RICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| ANTHONY PATRICK REED, | CV 13–17–BU–DWM |
| Plaintiff, | |
| vs. | OPINION and ORDER |
| DOUG LIEURANCE, in his individual capacity; BRIAN GOOTKIN, in his individual capacity; GALLATIN COUNTY SHERIFF'S OFFICE, a department of Gallatin County; and GALLATIN COUNTY, | |
| Defendants. | |

In May 2012, Defendant Doug Lieurance ("Deputy Lieurance" ) cited

Plaintiff Anthony Reed ("Reed") for obstructing a bison[1] herding operation

outside of Yellowstone National Park ("the Park"). Reed is a volunteer with the

---

[1] The *Encyclopedia Britannica* explains that buffalo "are indigenous to South Asia (water buffalo) and Africa (Cape buffalo), while bison are found in North America and parts of Europe." *What's the Difference Between Buffalo and Bison?* (https://www.britannica.com/demystified/whats-the-difference-between -bison-and-buffalo) (accessed 8 Dec. 2017). The Buffalo Field Campaign website addresses this issue, concluding "common usage has made the term 'buffalo' an acceptable synonym for the American bison." *Buffalo Basics* (http://www. buffalofieldcampaign.org/about- buffalo/buffalo-basics) (accessed 8 Dec. 2018). For the sake of consistency, the term "bison" is used throughout this opinion.

-1-

Buffalo Field Campaign ("Campaign"), a § 501(c)(3) non-profit conservation organization that sends volunteers to observe and document the herding or "hazing" of bison in or near the Park. *Reed v. Lieurance*, 863 F.3d 1196, 1201 (9th Cir. 2017). Pursuant to an interagency agreement, government personnel from a number of state and federal agencies carry out hazing operations as many as four or five times per week between December and July. *Id.* The Campaign provides video footage and information about the hazing to news outlets and government agencies. *Id.*

Reed brought this action pursuant to 42 U.S.C. § 1983, alleging that Deputy Lieurance's conduct violated Reed's First and Fourth Amendment rights and related Montana constitutional rights, and that Gallatin County, the Gallatin County Sheriff's Office, and Sheriff Brian Gootkin failed to train officers on Montana's obstruction statute and the First and Fourth Amendments. (Doc. 1.)

**FACTUAL BACKGROUND**

The facts as outlined below are those the parties have agreed to, (*see* Addt'l Stip. Facts, Doc. 147), and those viewed in the light most favorable to Reed, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam).

## I.    Bison Hazing Operations

At all times relevant to this case, Agent Rob Tierney, a Bison Program

-2-

Specialist from the Montana Department of Livestock ("Livestock Department"), was responsible for overseeing bison management operations outside of the Park. ((Doc. 147 at ¶¶ 1, 2.)  Operations within the Park were the responsibility of the National Park Service ("Park Service").  (*Id.*)  At that time, and in accordance with the Operating Procedures agreed to as part of the Bison Management Plan, the Livestock Department frequently requested law enforcement assistance from the Gallatin County Sheriff's Office ("Sheriff's Office").  (*Id.* at ¶ 3.)  When the Livestock Department planned a bison hazing operation, a briefing was held between officers of the Department, the Sheriff's Office, and any other agencies that had personnel involved in the operation.  (*Id.* at ¶ 4.)  At the briefing, the Livestock Department officer in charge of the operation, typically Agent Tierney, explained the planned operation and the approximate location, (*id.*), and the Sheriff's Office would coordinate haze-related law enforcement, (*id.* at ¶ 5).

## II.    The Incident

On May 23, 2012, there was a hazing operation which involved moving bison from the area of the Madison Arm Resort eastward and then across U.S. Highway 191, and back into the Park.  (*Id.* at ¶ 6.)  Reed and Kasi Craddock-Crocker were in a vehicle driving ahead of the operation as it headed east on Madison Arm Road.  (*Id.* at ¶ 7.)  Reed left the operation and drove to the junction

of Highway 191, Madison Arm Road, and Conservation Lane and parked near that junction. (*Id.* at ¶ 8.) While Reed was parked in that spot, Agent Tierney approached Reed's vehicle and spoke with Reed. (*Id.* at ¶ 9.) After speaking with Agent Tierney, Reed drove north of the Madison River and parked on a gravel road that runs parallel to Highway 191. (*Id.* at ¶ 10.) Tierney then radioed Deputy Lieurance. (*Id.* at ¶ 11.) Lieurance in turn radioed to the riders with the operation and told them to stop moving the bison, (*id.* at ¶ 12), which they did, (*id.* at ¶ 13). Deputy Lieurance drove to Reed's location and after speaking with Reed, cited him for misdemeanor obstruction, Mont. Code Ann. § 45-7-302. (*Id.* at ¶¶ 14, 15.) On July 10, 2012, the county prosecutor moved to voluntarily dismiss the citation. (Doc. 154-4 at 2.)

## III.   The Recording

The parties dispute the specifics of Reed's conversations with Agent Tierney and Deputy Lieurance, primarily the nature of the directions Agent Tierney gave them when he initially told them to move their car as well as how exactly they were obstructing the haze. There is a 22-minute recording of the second portion of Deputy Lieurance's stop, recorded by Craddock-Crocker. (*See* DVD, Ex. D, Doc. 151-4.). The recording begins after the initial conversation between Lieurance and Reed. Reed and Craddock-Crocker discuss the stop.

Craddock-Crocker then has brief interaction with law enforcement, where law enforcement insists she and Reed "failed to follow directions" and she insists the directions were not clear. Reed and Craddock-Crocker repeatedly refer to the "selective enforcement" of the law based on the other vehicles driving on the highway and even note they could probably sue if Reed were to be arrested. The video shows Reed's citation being issued. At that point, Deputy Lieurance explains that Reed is being cited for obstruction, which, according to Deputy Lieurance, is basically "doing something you were told not to do" or "stopping an operation of some sort." (*Id.* at 15:40.) Lieurance further explains Reed's obligation to contact the court. At one point, Lieurance asks Craddock-Crocker, who is filming, to take a step back. Reed clarifies that he is receiving a ticket. After the citation is issued, Craddock-Crocker again asks why they are being "selectively enforced against," and Deputy Lieurance states that he is not going to argue about it, and that they can either leave or he can take them to jail. (*Id.* at 18:10.) After a bit more back and forth, Reed and Craddock-Crocker drive away.

Neither parties' story is "blatantly contradicted" by the recording. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). While the video does not depict all of the events at issue, it does show the relative distance from the haze area and numerous other cars and trucks driving by on the highway during the stop.

-5-

## PROCEDURAL BACKGROUND

In March 2013, Reed filed suit, asserting that Deputy Lieurance's conduct violated Reed's First and Fourth Amendment rights and related Montana constitutional rights, and that Gallatin County, the Sheriff's Office, and Sheriff Gootkin failed to train officers regarding Montana's obstruction statute and the First and Fourth Amendments. (*See* Doc. 1.) The parties filed cross-motions for summary judgment and motions in limine. On July 23, 2014, the Court granted the defendants' motion for summary judgment on Reed's unreasonable seizure and failure-to-train claims, denied summary judgment on the First Amendment claims, and excluded Reed's police practices expert witness. On August 20, 2014, Reed moved to amend his complaint; that motion was denied on October 6, 2014. A jury trial was held in January 2015 on Reed's First Amendment claims. After Reed presented his case, the defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50, which was granted as to all remaining claims.

Reed appealed.[2] On appeal, the Ninth Circuit held that: (1) the defendants were not entitled to summary judgment as to Reed's unlawful seizure claim; (2) it

---

[2] The trial judge also denied the defendants' motion for attorneys fees pending resolution of an appeal. The defendants cross-appealed that ruling, and the Ninth Circuit held that it lacked jurisdiction to consider fees in the absence of a "final decision" from the district court as to that issue. *Reed*, 863 F.3d at 1212.

was improper to *sua sponte* dismiss Reed's failure-to-train claim under Rule

12(b)(6); (3) the wrong legal standard was applied in excluding Reed's expert

witness; and, (4) the defendants were not entitled to judgment as a matter of law as

to Reed's First Amendment claims. *See Reed*, 863 F.3d at 1204-12. The case was

remanded and reassigned. *See id.* at 1213.

Following remand, Reed filed a First Amended Complaint, alleging six

causes of action, including: Count I (unreasonable seizure - Fourth Amendment),

Count II (unreasonable restriction - First Amendment), Count III (retaliation - First

Amendment), Count IV (failure to train - *Monell*[3]), Count V (privacy - Mont.

Const. art. II, sections 10 and 11), and Count VI (unreasonable restriction - Mont.

Const. art. II, sections 6 and 7). (Doc. 146.) Two defense motions are currently

pending: (1) a motion for summary judgment as to Reed's failure-to-train claim,

(Doc. 150) and (2) a motion to exclude the expert testimony of Reed's police

practices expert, Timothy Longo, (Doc. 144). Having considered the parties'

briefing and oral argument, both motions are denied.

## SUMMARY CONCLUSION

The defendants argue that summary judgment is appropriate as to Reed's

failure-to-train claim because the undisputed evidence shows that Deputy

---

[3] *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978).

Lieurance was trained and Reed fails to identify a "specific inadequacy" in the training deputies receive. However, there exists a genuine dispute of material fact as to: (1) whether the training received by deputies on Montana's obstruction statute, the First Amendment, and the Fourth Amendment was adequate; (2) whether there was an obvious or recurring need for more or better training; and (3) whether there is a causal link between a deficiency in training and the alleged constitutional harm. Drawing all reasonable inferences in favor of Reed, *Tolan*, 134 S. Ct. at 1866, a jury could find that the defendants' failure to train amounts to a "deliberate indifference to the rights of persons with whom [its] employees come into contact," *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks and alteration omitted). Additionally, because the testimony of Reed's police practices expert, Timothy Longo, is reliable and relevant to that failure-to-train claim, Fed. R. Evid. 702, it is not excluded.

## ANALYSIS

## I.   Motion for Summary Judgment

### A.   Legal Standard

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where

the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

## B.   Failure to Train

The defendants seek summary judgment as to Reed's *Monell* claim, which alleges failure to train as to the First and Fourth Amendments and Montana's obstruction statute. (Doc. 150.) They previously moved for summary judgment on this claim, (*see* Doc. 13), but Reed's claim was dismissed *sua sponte* under Rule 12(b)(6). The Ninth Circuit reversed, holding that it was error not to provide proper notice and not give Reed an opportunity to amend. *Reed*, 863 F.3d at 1207-08. The Ninth Circuit further declined to consider Plaintiff's failure-to-train claim under Rule 56, "affording the district court a chance to consider this question." *Id.* at 1208 n.5.

Reed alleges that the defendants "do not provide adequate training for sheriff's deputies on the elements, meaning, and lawful application of Montana's obstruction statute, or on the constitutional rights of members of the public, namely the Fourth Amendment right to be free from unreasonable seizure and First

Amendment rights under the U.S. Constitution." (Doc. 146 at ¶ 147.) He further

alleges that the defendants "have an unconstitutional policy that allows sheriff's

deputies to use the Montana obstruction statute to arrest individuals who are

engaged in constitutionally protected conduct." (*Id.* at ¶ 148.)

"[T]he inadequacy of police training may serve as the basis for § 1983

liability only where the failure to train amounts to deliberate indifference to the

rights of persons with whom the police come into contact." *Flores v. Cnty. of*

*L.A.*, 758 F.3d 1154, 1158 (9th Cir. 2014) (quoting *City of Canton v. Harris*, 489

U.S. 378, 388 (1989)). Because "a municipality can be liable under § 1983 only

where its policies are the moving force behind the constitutional violation," *City of*

*Canton*, 489 U.S. at 388 (quotation marks and alteration omitted), Reed "must

demonstrate a conscious or deliberate choice on the part of" the defendants,

*Flores*, 758 F.3d at 1158 (quotation marks omitted). He must allege facts showing

the defendants "disregarded the known or obvious consequence that a particular

omission in their training program would cause [county] employees to violate

citizens' constitutional rights." *Id.* at 1159 (quoting *Connick*, 563 U.S. at 62).

Although "a pattern of similar constitutional violations by untrained

employees is ordinarily necessary to demonstrate deliberate indifference," *id.*, the

Supreme Court has "not foreclose[d] the possibility that evidence of a single

violation of federal rights, accompanied by a showing that a municipality has

failed to train its employees to handle recurring situations presenting an obvious

potential for such a violation, could trigger municipal liability," *Bd. of Cnty.*

*Com'rs of Bryan Cnty., Okl. v. Brown (Brown)*, 520 U.S. 397, 409 (1997). As

further explained:

> in a narrow range of circumstances, a violation of federal rights may be
> a highly predictable consequence of a failure to equip law enforcement
> officers with specific tools to handle recurring situations. The
> likelihood that the situation will recur and the predictability that an
> officer lacking specific tools to handle that situation will violate
> citizens' rights could justify a finding that policymakers' decision not to
> train the officer reflected 'deliberate indifference' to the obvious
> consequence of the policymakers' choice—namely, a violation of a
> specific constitutional or statutory right. The high degree of
> predictability may also support an inference of causation—that the
> municipality's indifference led directly to the very consequence that was
> so predictable.

*Id.* at 409-10. Construing the evidence in Reed's favor, a jury could find that the

defendants' failure to train amounts to deliberate indifference to the rights of

persons with whom deputies come into contact. *City of Canton*, 489 U.S. at 388.

### 1.    A Constitutional Violation

As a threshold matter, the defendants argue that because Reed cannot

establish a constitutional violation by Deputy Lieurance, he cannot maintain a

*Monell* claim. *See Jackson v. City of Bremerton*, 268 F.3d 646, 653-54 (9th Cir.

2001) ("Neither a municipality nor a supervisor . . . can be held liable under § 1983 where no injury or constitutional violation has occurred."). The Ninth Circuit, however, held that a reasonable jury could conclude that Deputy Lieurance's seizure of Reed was unreasonable, *see Reed*, 863 F.3d at 1205-07, or that Deputy Lieurance violated Reed's First Amendment rights, *see id.* at 1211-12.

### 2.    Deputy Lieurance's Training

The defendants further insist that Deputy Lieurance was more than adequately trained on the parameters of Montana's obstruction statute and the First and Fourth Amendments. They note Deputy Lieurance received BASIC police training and was certified through the Arizona Law Enforcement Academy, and then attended an equivalency program through the Montana Law Enforcement Academy. (Doc. 151, at ¶¶ 1-2.) However, Daniel Springer, the designated representative of the Sheriff's Office for training issues, merely states that the Montana Law Enforcement Academy and in the equivalency program spend time on training in these areas, (*see* Springer Depo., Doc. 151-2 at 4), but does not identify what it entails. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1159-60 (1st Cir. 1989) (noting that reasonable inferences could be drawn in plaintiff's favor if there was little to no formal training at initial academy courses and then no updated training afterward). Moreover, Deputy Lieurance admits that he did not

-12-

receive any training specifically related to the First Amendment or the cross-section between the First Amendment, Fourth Amendment, and Montana's obstruction statute. (Doc. 151-1 at 5-6.) That lack of training is reflected in his training records. (*See* Doc. 154-7.) Yet the defendants insist that Craddock-Crocker's video depicting the issuance of the citation definitively establishes Deputy Lieurance was adequately trained. Such an interpretation of the video ignores the Ninth Circuit's conclusion to the contrary. *See Reed* 863 F.3d at 1211-12 (discussing the myriad of ways a jury could find a First Amendment violation).

The defendants then insist that it is not enough to show that Deputy Lieurance alone did not receive adequate training. While Deputy Lieurance's training alone is not dispositive, *Blankenhorn v. City of Orange*, 485 F.3d 463, 484-85 (9th Cir. 2007) (holding that showing individual officer was not adequately trained is not sufficient to show deliberate indifference), it is evidence of the alleged overarching inadequacy. Moreover, additional evidence indicates that deputies generally receive little to no training on First Amendment issues and that the Sheriff's Office believes no such training is necessary.

### 3.   First Amendment Claim

"In resolving the issue of a [county]'s liability, the focus must be on the adequacy of the training program in relation to the tasks the particular officers

must perform." *See City of Canton*, 489 U.S. 389.  The defendants insist that

Reed's claim must fail because he does not identify a "specific inadequacy" in the

training program.  However, Reed raises a genuine factual dispute as to what First

Amendment training the deputies receive, if any, and whether that training is

adequate given the deputies' regular contact with Campaign volunteers.

Sheriff Gootkin testified in his deposition that the First Amendment may be

part of the Field Training Program, but that he was not aware of the specific

training his deputies receive.  (Doc. 154-6 at 6-9.)  Springer, contradicting

Gootkin, stated that the Field Training Manual does not include anything specific

to the First Amendment, (Doc. 151-2 at 4), and that during the time period of

Deputy Lieurance's employment, "[t]here [wa]s nothing – there is no documented

training on freedom of speech training that I am aware of," (Doc. 154-8 at 8).  (*See*

*also* Daugherty Depo., Doc. 154-9 at 6 (stating he also did not receive any First

Amendment training).)  A review of the table of contents of the Field Training

Manual also shows no specific First Amendment entry.  (*See* Doc. 154-3 at 3.)

There is an entry related to obstruction citations, (*id.*), but no further detail.

Springer also implied such training is not necessary:

[The] First Amendment is very simple – we – we instruct our guys that
you are – you cannot impede someone's ability to freedom [sic] of
speech, you cannot impede their ability to film you unless there's a

particular – you know, reasonable time, place and manner for that. It's not a very difficult thing to train on. It's something that is discussed, but it's a very – it's fairly basic.

(Doc. 151-2 at 4.) He further stated, "there is a standard that is set at the basic level and it's not one that changes. Freedom of speech has been that way for a very long time, so it's a very simple concept." (Doc. 154-8 at 8.)

Based on the testimony of Sheriff Gootkin and Springer, there is a genuine issue of material fact as to whether the Sheriff's Office believes First Amendment training is necessary and what training, if any, deputies receive. Reed's police practices expert, Mr. Longo, opines that First Amendment issues are more complicated than Springer indicated and training on those issues is vital. (*See, e.g.*, Expert Report ¶¶ 118-19, 237-39.) Moreover, Longo's report presents evidence as to what type of training should be administered and why. (*See id.*, ¶¶ 191-94 (referencing guidance from the Rutherford Institute); *id.* at. ¶ 106 (referencing technical assistance letters produced by the Department of Justice).) The necessity and adequacy of such training is only made more acute considering the regular contact between the Sheriff's Office and volunteers of the Campaign. (*See* Springer Depo., Doc. 154-8 at 11 (stating that the Sheriff's Office supports hazing operations "a number of times a year," estimating "10 to 12")); *Reed*, 863 F.3d at 1201 (9th Cir. 2017) (estimating government personnel carry out hazing

operations as many as four or five times per week between December and July).

The defendants further argue that Reed fails to show the requisite causal connection between the perceived inadequacy and his alleged harm. However, the recurrent contact between the Sheriff's Office and Campaign volunteers "and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflect[s] 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely the violation of [the] specific constitutional or statute rights" Reed identifies. *Brown.*, 520 U.S. at 409. That predictability "also support[s] an inference of causation—that the [defendants'] indifference led directly to the very consequence that was so predictable." *Id.* at 410.

Reed also presents evidence that the prosecutor's office has dismissed obstruction citations under similar circumstances on more than one occasion. (*See* Doc. 154-5 at 2, 4, and 6 (identical motions to dismiss in cases against Reed, Noah Richards, and Andrea Rightsell).) Although such evidence may not independently show "a pattern of similar constitutional violations by untrained employees," *Flores*, 758 F.3d at 1159, it supports Reed's contention that the interaction between deputies and Campaign members is a recurrent issue and that a resulting constitutional violation was predictable. The defendants present an

affidavit from the prosecuting attorney insisting that Reed's dismissal was not because the citation was infirm, but rather due to a "shortage of prosecutors," and "speedy trial concerns." (Aff. Murphy, Doc. 151-5 at 3.) The motions to dismiss themselves, however, state the grounds for dismissal as "best interests of justice." (*See* Doc. 154-5.) Drawing all reasonable inferences in favor of Reed, a jury could find that the citations were dismissed as improperly issued. A reasonable jury could therefore find that the Sheriff's Office "disregarded the known or obvious consequence" of its failure to train and that its failure caused the alleged constitutional violation. *Flores*, 758 F.3d at 1158-59. Even if Reed cannot show that Sheriff Gootkin knew of such dismissals or the reason for them, (Doc. 154-6 at 16), the admission that the Sheriff's Office did not even consider tracking dismissed citations may also be evidence of deliberate indifference, (*id.* at 18). *See Larez v. City of L.A.*, 946 F.2d 630, 645 (9th Cir. 1991) (explaining that policy or custom can be inferred from a subsequent acceptance of a subordinate's actions or a lack of discipline or reprimand in the face of such action).

### 4. Fourth Amendment Claim

Reed comes precariously close to waiving his failure-to-train claim as it relates to the Fourth Amendment and probable cause under Montana's obstruction statute. That claim, while premised on much of the same argument and evidence

-17-

as his First Amendment claim, is more narrow.  Essentially, Reed alleges that the

deputies are inadequately trained on the limits Montana jurisprudence places on

the obstruction statute.  *See City of Kalispell v. Cameron*, 46 P.3d 46, 47 (2002).

The Ninth Circuit held that a jury could find either that Deputy Lieurance lacked

probable cause to believe Reed was obstructing the haze or, alternatively, lacked

probable cause to believe Reed had the necessary specific intent to impede the

haze.  *Reed*, 863 F.3d at 1205-06.  It also held that a jury could find that Deputy

Lieurance "issued the citation for one or more reasons that do not satisfy the

Fourth Amendment."  *Id.* at 1206.  Based on the evidence discussed above and the

previous rulings of the Ninth Circuit, genuine factual disputes prevent summary

disposition of this claim.  That said, depending on the evidence presented at trial,

this claim—like all others—may be subject to a Rule 50 motion.

## C.    Sheriff's Office

The defendants argue in a footnote that the Sheriff's Office should be

dismissed from the case as an improper defendant.  Reed correctly argues that the

request is improperly made, *City of Emeryville v. Robinson*, 621 F.3d 1251, 1262

n.10 (9th Cir. 2010) ("By failing to address the issue in its opening brief except in

a footnote, Sherwin-Williams waived [its] claim . . . ."), and is without support in

the law, *Streit v. Cnty .of L.A.*, 236 F.3d 552, 555-56 (9th Cir. 2001) (concluding

-18-

that the Los Angeles Sheriff's Department "is separately suable in federal court").

Accordingly, the defendants' motion for summary judgment is denied.

## II.    Motion to Exclude

The defendants also seek to exclude the opinions and testimony of Reed's expert, Timothy Longo, Sr., the Chief of Police of Charlottesville, Virginia.  (Doc. 144.)  The Court previously excluded Mr. Longo from offering expert testimony on various grounds.[4]  (*See* Doc. 45 at ¶ 4.)  On appeal, the Ninth Circuit determined that an improper legal standard was applied.  *See Reed*, 863 F.3d at 1208-09.  It further clarified that Mr. Longo's testimony may be relevant to the revived failure-to-train claim, but that this Court may consider on remand whether Mr. Longo's testimony may be stricken "under the proper legal standard."  *Id.*

At issue here, the defendants seek to exclude Mr. Longo's testimony as irrelevant.  Rule 702, Fed. R. Evid., provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in

---

[4]  First, the trial judge concluded that an expert may only rely upon evidence that is in the record or is "of the sort that any expert would rely on."  *Reed*, 863 F.3d at 1208.  Second, he found Mr. Longo's testimony commented on the ability of others to do their job.  *Id.* at 1208-09.  Third, he found the report made disparaging comments about the prosecution.  *Id.* at 1209.

issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Expert testimony on police practices has generally been found to be admissible in cases involving allegations of police misconduct. *See, e.g.*, *Larez*, 946 F.2d at 635 (discussing trial testimony of police practices expert); *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc) (offering expert testimony as to police dog use and training); *Davis v. Mason Cnty.*, 927 F.2d 1473, 1484-85 (9th Cir. 1991) (allowing expert testimony as to failure-to-train claim). However, under Rule 702, the district court has an independent duty to ensure that such testimony is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see also Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007). The question of reliability asks "whether an expert's testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *Kumho Tire*, 526 U.S. at 149). But even reliable expert testimony must still be helpful to the jury's determination of the material factual questions at hand. *See Stilwell*, 482 F.3d at 1192 (requiring "a link between the expert's testimony and the matter to be

-20-

proved"). The opinion must be sufficiently tied to the facts of the case to aid the trier of fact in resolving a disputed fact, "fit" the facts of the case, and serve a "helpful" purpose to the jury. *Daubert*, 509 U.S. at 591.

Here, Mr. Longo's report describes his background and experience, (¶¶ 1-12), and outlines a factual summary of the case, (¶¶ 13-30). The report then outlines two questions presented:

31. Whether the actions taken by Deputy Doug Lieurance on the morning of May 23, 2012, were consistent with generally accepted law enforcement practices at the time of the incident.

32. Whether the policies, training, and supervision of the Gallatin County Sheriff's Office were consistent with generally acceptable law enforcement practices at the time of this incident.

(Report, Doc. 145-1.) The report first addresses Deputy Lieurance's actions, (¶¶ 33-82), and then addresses municipal liability in the context of "Policy," (¶¶ 94-119), "Practices," (¶¶ 120-65), "Training," (¶¶ 166-200), and "Supervision and Investigation," (¶¶ 201-36). Finally, the report states Mr. Longo's conclusions as to both issues, (¶¶ 237-79).

Although the defendants primarily challenge the relevancy—not the reliability—of Mr. Longo's testimony, both elements of Rule 702 are discussed below. *See Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004) (requiring district courts to make a reliability determination).

## A.    Reliability

Mr. Longo's testimony is reliable.  He has an extensive history as a law enforcement officer with the Baltimore Police Department and additional experience training and teaching other law enforcement officers.  (*See* Report, ¶¶ 1-9.)  As of the date of his report, he was the Chief of Police in Charlottesville, Virginia, and was consistently involved with police training and procedure programs throughout the nation.  (*Id.*)  His methods are also those used by other experts in this field and applied in a predictable, reasonable manner.  Mr. Longo reviewed relevant documents in the case, including video and audio recordings, as well as the Gallatin County training manuals.  (*Id.* at ¶¶ 10, 166.)  He then reached an opinion as to the facts he reviewed "based upon [his] education, specialized experience, training, and knowledge of police practices as well as [his] continued research and work with law enforcement nationally."  (*Id.* at ¶ 11.)  His report specifically states that his opinions are not based on credibility determinations, (*id.* at ¶ 12), and that he did not make any findings as to probable cause, (*id.* at ¶ 33), or whether Deputy Lieurance's actions amounted to a constitutional violation, (*id.* at ¶ 34).  As his report makes clear, Mr. Longo lays out the facts that form the basis of his opinions and explains how he reached his conclusions.

**B.    Relevance**

Mr. Longo's testimony is relevant.  Specifically, Mr. Longo's testimony will help the jury assess Reed's failure-to-train claim.[5]  The crux of the defendants' argument is that Mr. Longo's opinions should be excluded because they relate to questions of negligence, as opposed to constitutional deficiency.  *See Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) ("Mere negligence in training . . . does not give rise to a *Monell* claim.").  The defendants' distinction is one without difference in this context.  *See* Fed. R. Evid. 401(a).  Following the defendants' argument to its logical conclusion, a police practices expert cannot testify to mere adequacy of training because to do so would be irrelevant, but that expert also cannot testify as to the constitutionality of police conduct because that would be an impermissible legal conclusion.  The defendants' argument would effectively foreclose any expert testimony under these circumstances.  That position is not tenable.  As discussed above, for the failure to train to serve as a basis for § 1983 liability, it must "amount[] to deliberate indifference to the rights of persons with whom the police come into contact."  *Flores*, 758 F.3d at 1158 (quoting *City of Canton*, 489 U.S. at 388).  Mr. Longo's proffered opinions

---

[5] Reed's response is limited to Mr. Longo's testimony about failure-to-train, and he agrees that Mr. Longo will not testify as to whether individual constitutional violations occurred.  (Doc. 149 at 28.)

regarding the adequacy of the training received are relevant to that question. *See*
Ninth Cir. Model Civ. Jury Instr. No. 9.8 (2017) (outlining the elements of a
failure-to-train claim, including the requirement the plaintiff prove the defendant's
training policies "were not adequate").

 In arguing that Mr. Longo's testimony should be excluded, the defendants
rely heavily on *Smith v. State of New Jersey*, 2013 WL 3658786 (D.N.J. 2013), a
case also involving Mr. Longo's expert opinion.  There, the plaintiffs alleged
claims pursuant to 42 U.S.C. § 1983 on the grounds of unlawful arrest, excessive
force in making an arrest, and unlawful warrantless entry.  *Smith*, at *1.  In
excluding Mr. Longo's proffered testimony, the court ultimately concluded that
"Rule 702 . . . does not permit the testimony of a police practices expert who is
rendering opinions about whether particular conduct violated the relevant
constitutional provisions."  *Id.* at *5.  However, the *Smith* plaintiffs did not raise a
failure-to-train claim.  *See id.* at *4 (noting the plaintiffs "do not claim that the
State failed to properly train [the officer]" or that officer training was an issue).
*Smith* therefore provides limited guidance here.

 The defendants also rely on Judge Lynch's decision regarding Mr. Longo's
testimony in *Chaney v. Wadsworth*, 2015 WL 4388420 (D. Mont. 2015).  In
*Chaney*, Mr. Longo was asked to opine as to the use of force and detention arising

out of a physical altercation between law enforcement and two brothers outside of

a bar.  In his opinion, Judge Lynch excluded certain portions of Mr. Longo's

report and testimony based on specific objections by the defendants.  However, the

determination in *Chaney* that Mr. Longo's testimony may be relevant to a claim

for negligent failure to train, *id.* at *8, does not foreclose its potential relevance to

a § 1983 claim for failure to train as well, *see id.* at *15 (holding that the "ultimate

determination as to the relevance of th[at] opinion is deferred until trial to be made

in the proper context of the evidence presented at trial").  As discussed above,

adequate training for identifying and addressing the intersection between the First

Amendment, Fourth Amendment, and Montana's obstruction statute is disputed.

Because Mr. Longo has specialized experience with police practices, his testimony

may help the jury interpret and understand the evidence, *see Muktar v. Cal. St.*

*Univ. Hosp.*, 299 F.3d 1053, 1063 n.7 (9th Cir. 2002) ("Encompassed in the

determination of whether expert testimony is relevant is whether it is helpful to the

jury, which is the 'central concern' of Rule 702."), and determine whether the

deputies receive adequate training, *Davis*, 927 F.2d at 1483 ("The issue is not

whether the officers had received *any* training—most of the deputies involved had

some training, even if it was minimal at best—rather the issue is the adequacy of

that training.").

That said, as was the case in *Chaney*, Mr. Longo's testimony is limited in certain respects by the Federal Rules of Evidence and related case law. First, his testimony is limited insofar as portions of his report state the facts of the case, (*see* ¶¶ 13-30, 66, 54-81, 176-78, 186-88), comment on the evidence (*see* ¶¶ 68, 69, 72, 73, 75, 76, 78, 79, 124, 183-85, 189), or outline the applicable law, (*see* ¶¶ 36-52, 65, 67, 70, 83-93, 137-44, 179). While those facts and legal principles are those upon which Mr. Longo may rely in forming his opinion, they need not be presented through his testimony, *Chaney*, at *7, and the Court will instruct the jury on the law, *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993).

Additionally, Mr. Longo "cannot give an opinion as to h[is] *legal conclusion, i.e.,* an opinion on an ultimate issue of law." *See Muktar*, 299 F.3d at 1065 n.10 (emphasis in original); *see also Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058-60 (9th Cir. 2008). Rule 704(a) explicitly allows expert witnesses such as Mr. Longo to express an opinion that "embraces an ultimate issue." And, as stated in the previous appeal in this matter, "a police practices expert may provide helpful testimony regarding whether there was a failure to train without veering into improper legal opinions." *Reed*, 863 F.3d at 1209 (citing *Johnson v. Hawe*, 388 F.3d 676, 686 (9th Cir. 2004)); *Hangarter*, 373 F.3d at 1016. Nevertheless, the Ninth Circuit recently emphasized the fine line

drawn by Rule 704(a):

> Although the value of expert testimony lies in the specialized knowledge
> that an expert brings to bear on an issue in dispute, Fed. R. Evid. 702(a),
> it is sometimes impossible for an expert to render his or her opinion on
> a subject without resorting to language that recurs in the applicable legal
> standard.  We hold that if the terms used by an expert witness do not
> have a specialized meaning in law and do not represent an attempt to
> instruct the jury on the law, or how to apply the law to the facts of the
> case, the testimony is not an impermissible legal conclusion. *See* Fed. R.
> Evid. 702(a), 704(a).

*United States v. Diaz*, ___ F.3d ___, 2017 WL 6030724, at *4 (9th Cir. Dec. 6,

2017) (holding that expert testimony that prescriptions were not given for

"legitimate medical purpose" did not contain impermissible legal conclusion)

(footnotes omitted).  The primary term of art that raises concern here is

"constitutional."  Mr. Longo's report indicates that he may offer an opinion as to

whether the training provided by the Sheriff's Office was constitutionally adequate

or whether there is a causal connection between the failure to train and the

constitutional harm alleged.  During oral argument, Reed's counsel indicated Mr.

Longo does not plan to open this particular pandora's box.  We shall see.  Such

testimony may be properly subject to objection and further discussion in the

context of trial.

Finally, the defendants raise specific relevancy objections in only four areas.

The ultimate determination as to the relevance of Mr. Longo's testimony in these

four areas is more appropriately "made in the proper context of the evidence presented at trial." *Chaney*, at *15. However, these topics are discussed below as to establish threshold relevancy to meet the requirements of Rule 702. *See Kumho Tire Co.*, 526 U.S. at 147. First, the defendants object to statements and testimony related to a lawsuit against the City of Baltimore alleging First and Fourth Amendment violations. (*See* Report, ¶¶ 100-117.) These paragraphs describe the circumstances upon which the Department of Justice issued a technical assistance letter to the Baltimore Police Department regarding First Amendment training. (*See, e.g.*, ¶ 106.) This portion of Mr. Longo's report is relevant to the nature and necessity of First Amendment training and the bases for his opinion. While Mr. Longo may not restate legal standards or principles of law, his testimony will not be prematurely excluded.

Second, the defendants challenge the portions of Mr. Longo's report that opine on "contempt of cop." (*See* Report, ¶¶ 146-157.) Judge Lynch excluded such testimony in *Chaney*, explaining that it speaks to the legal application of probable cause to arrest as it "may influence a law enforcement officer to unlawfully arrest a citizen in the absence of probable cause." *Chaney*, at *5. Such testimony is more relevant here than it was in *Chaney* as Reed is likely to argue that Deputy Lieurance issued the citation based on Reed's perceived failure to

follow law enforcement's directions, not based on obstructing the hazing operation. While Mr. Longo cannot instruct the jury on the applicable law or opine as to whether Deputy Lieurance had probable cause, the Court will not prematurely exclude such testimony.

Third, the defendants seek to exclude Mr. Longo's report and testimony as it relates to the Rutherford Institute, (*see* Report, ¶¶ 190-97), a civil liberties organization that is used by law enforcement to aid in the development of policy and training for officers, (*id.* at ¶¶ 190-91). Because this Institute and its work are generally relevant to both the necessity and nature of First Amendment training, as well as the bases for Mr. Longo's opinions, it is not excluded. Once again, however, Mr. Longo's testimony is limited as outlined above.

Finally, the defendants seek to exclude testimony as to supervisory issues and the failure to track dismissed citations. The actions taken by law enforcement in response to an officer's conduct (such as reporting, discipline, reprimand) may be relevant to a "deliberate indifference" inquiry. *See Larez*, 946 F.2d at 645. It would be premature to exclude any of this testimony until Reed presents evidence under his theory of *Monell* liability at trial.

Because Mr. Longo's testimony meets Rule 702's threshold requirements, the defendants' motion to exclude Mr. Longo's testimony on those grounds is

denied, subject to the limits outlined above.  The defendants are also permitted to renew the specific objections discussed above in the context Mr. Longo's trial testimony.  *See* Fed. R. Evid. 103(b).

### C.    Rule 403

Rule 403 states, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  In their briefing, the defendants do not identify a Rule 403 concern.  At oral argument, however, defense counsel intimated that allowing Mr. Longo to testify to an industry standard of care, i.e., a negligence standard, would confuse the jury and could cause the jury to find liability despite the heightened requirements of municipal liability under § 1983.  Not only is that concern not borne out by the Mr. Longo's report or the opinions proffered therein, but the jury instructions issued prior to deliberation will prevent prejudice as they specifically outline the standard for "deliberate indifference."  *See* Ninth Cir. Model Civ. Instr. No. 9.8. Rule 403 does not compel the exclusion of Mr. Longo's testimony.

### CONCLUSION

Based on the foregoing, IT IS ORDERED that the defendant's motion for

summary judgment (Doc. 150) is DENIED.  The defendants' motion to exclude

Mr. Longo's expert testimony (Doc. 144) is also DENIED, but that testimony is

subject to the limitations outlined above.  The defendants may renew their specific

relevancy objections in the context of trial.  *See Bechtold v. Billings Police Dep't*,

2010 WL 11534416, at *1 (D. Mont. 2010).

      DATED this ⸤⸤ day of December, 2017.

                                Donald W. Molloy, District Judge
                                United States District Court